**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:    (818) 532-6499
E-mail: jpafiti@pomlaw.com

*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER J. ERRICHIELLO, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RH, GARY G. FRIEDMAN, and KAREN BOONE,<br><br>Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Peter J. Errichiello, Jr. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RH ("RH" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of RH between March 26, 2015 and June 8, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      RH is a leading luxury retailer in the home furnishing marketplace.  The Company operates an integrated business with multiple channels of distribution including over 70 retail stores in the United States, source book magazines and websites.

3.      Founded in January 1979, the Company was formerly known as "Restoration Hardware Holdings, Inc." and changed its name to RH in January 2017.  RH is headquartered in Corte Madera, California.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RH."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to Defendants' representations that the Company was prepared for the launch of RH Modern, that inventory was adequate, and that customers would not face shipping delays, in reality, the Company had severely inadequate inventory and was woefully unprepared to launch RH Modern; and (ii) as a result, RH's public statements were materially false and misleading at all relevant times.

5.      The Company and its executives publicly touted RH Modern as its "finest work ever," a "game-changer" that was poised to double the Company's revenue, and "the most important and significant new home furnishings business to be launched in the last 15 or 20 years." Bolstering these

2

statements, the Company repeatedly issued revenue guidance that led investors to expect substantial increases in revenue due in significant part to the supposed new revenue to be generated by RH Modern.

6.    In early 2015, the Company's core product line was facing headwinds as same store sales were decreasing. Specifically, in the RH's earnings report for the first quarter of 2015, the Company announced its comparable store sales were down 9% from the previous quarter. To reinvigorate RH's earnings, the Company began implementing its critical new product line, RH Modern. On June 11, 2015, the Company officially announced it would be releasing RH Modern later that fall. From the start of the Class Period, the Company touted its preparedness for the launch of RH Modern and increased its fiscal 2015 revenue guidance to $2.146 billion to $2.176 billion, representing growth in the range of 15% to 17% from the prior year. After raising its earnings-per-share ("EPS") guidance to $2.95 to $3.10 for fiscal 2015 the previous quarter, the Company again raised its earnings guidance to a range of $3.02 to $3.15, representing growth in the range of 28% to 33% year-over-year. RH attributed the growth in revenue and earnings, in large part, to the release of RH Modern. In the months leading up to the release of RH Modern, the Company continued to tout the new product line, including the Company's ability to have the new RH Modern products in-stock so that customers would receive furniture they ordered in a timely manner. In truth, the Company was woefully unprepared to launch RH Modern and to capitalize on the new product line. In December 2015, when RH Modern inventory problems began to emerge, the Company repeatedly downplayed the significance of the problems related to RH Modern, preventing investors from learning the full truth.

7.    Contrary to Defendants' representations that the Company was prepared for the launch of RH Modern, in reality, the launch of RH Modern was an abject catastrophe. The Company knew that it was not prepared to introduce RH Modern on a timetable and at the quality level that its clients expected, but Defendants nonetheless assured investors of near-term profits to be driven by the new

3

product line. As Defendants knew during the Class Period, the introduction of RH Modern was beset with a host of problems, including a near-complete lack of inventory, countless shipping delays, customer cancelations and returned products.

8.      On December 10, 2015, the Company announced it had missed its earnings projections due, in part, to the fact that RH Modern furniture was not fully in-stock.  On this news, RH's share price fell $8.94 or 10.20% over two trading days, to close at $78.65 on December 14, 2015.  To stem the decline, the Company made a number of reassuring statements, including touting the launch of RH Modern as "phenomenal" and falsely attributing the low inventory of RH Modern products to a purported strategy of conservatively managing purchases for the new product line.

9.      On February 9, 2016, the Company announced the surprise resignation of its Chief Operating Officer ("COO"), Kenneth Dunaj ("Dunaj"), who just one year prior had been put in charge of inventory management.

10.     On February 24, 2016, the Company announced disappointing earnings for the fourth quarter of 2015 due to shipping delays of the RH Modern furniture. On this news, RH's share fell $13.43, or 25.86%, to close at $38.49 on February 25, 2016.  In an effort to mitigate the market reaction, the Company continued to tout RH Modern as a success and assured investors that the RH Modern inventory problems were behind them.

11.     On June 8, 2016, RH announced the Company's financial and operating results for the first quarter of 2016 and significantly reduced its earnings guidance for fiscal year 2016, citing "accommodations largely due to . . . production delays" in RH's new product line, RH Modern, which the Company had previously touted as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."  On this news, RH's share price fell $7.66, or 21.24%, to close at $28.41 on June 9, 2016.

4

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  RH's principal executive offices are located within this Judicial District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in the accompanying Certification, purchased common shares of RH at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

18.     Defendant RH is incorporated in Delaware, and the Company's principal executive offices are located at 15 Koch Road, Suite K, Corte Madera, California 94925.  RH's common stock trades on the NYSE under the ticker symbol "RH."

19.     Defendant Gary G. Friedman ("Friedman") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman.

20.     Defendant Karen Boone ("Boone") has served at all relevant times as the Company's Chief Financial and Administrative Officer.

21.     The Defendants referenced above in ¶¶ 19-20 are sometimes referred to- herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     RH is a leading luxury retailer in the home furnishing marketplace.  The Company operates an integrated business with multiple channels of distribution including over 70 retail stores in the United States, source book magazines and websites.  In early 2015, the Company's core product line was facing headwinds as same store sales were decreasing. Specifically, in RH's earnings report for the first quarter of 2015, the Company announced its comparable store sales were down 9% from the previous quarter. To reinvigorate RH's earnings, the Company began implementing its critical new product line, RH Modern. The Company's CEO, Friedman, touted RH Modern as "the most innovative and new concept in the world of home design" and claimed it "represents our finest work to date." He went on to describe RH Modern as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."

23.     Prior to the release of RH Modern, Defendants repeatedly assured investors that the Company was prepared for the launch of the product and would have the appropriate amount of inventory in stock so that customers would not experience delays in receiving RH Modern products they ordered. For example, Friedman stated "[o]n the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today. We are going to compete on speed just

like we would our current business." He continued, "it's going to be a huge competitive advantage versus how the marketplace exists and operates today."

24.     In truth, the Company was woefully unprepared for the RH Modern launch as it knowingly gave vendors unrealistic timelines to manufacture products. This led to the Company having a near-total lack of inventory when the product line was launched leading to severe shipping delays and customer cancelations. Further, many customers who did receive RH Modern products ended up returning the products because they were defective due to the fact that vendors had to rush to create the product.

25.     In addition, after the release of RH Modern, Defendants repeatedly downplayed issues surrounding RH Modern, including low inventory levels, shipping delays, and customer cancelations, thus preventing investors from realizing the true nature and impact of the problems.

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on March 26, 2015, when the Company reported its results for the fourth quarter and fiscal year 2014, and announced the release of RH Modern later in the year. On that day, the Company touted RH Modern as its "finest work ever" and a "game-changer" for the Company. Based on this, the Company raised its 2015 EPS guidance to $2.95 to $3.10, representing growth in the range of 25% to 31% from fiscal 2014. The Company emphasized to investors that it would have no trouble meeting the inventory needs that the new RH Modern product line would require. Boone stressed that the Company would "continue to make inventory investments to make sure that [the Company] improve[s] our in-stocks and make sure we're not having high back orders." Friedman further emphasized the Company's strong inventory management stating, "Ken Dunaj, our Chief Operating Officer, has recently taken over inventory management. He has a new leader in that area of the business. I think we have more intelligence, more energy and passion behind inventory management than ever in the history of our Company right now."

7

27.     On June 11, 2015, during RH's 2015 first quarter earnings call, the Company announced that RH Modern would officially be released in the fall and increased its revenue guidance to $2.146 billion to $2.176 billion, representing growth in the range of 15% to 17%, and raised its EPS guidance to a range of $3.02 to $3.15, representing growth in the range of 28% to 33% from fiscal 2014 based largely on the RH Modern release. Friedman continued to tout RH Modern, calling it the "most innovative and new concept in the world of home design" and claiming it could double the Company's revenue saying, "could RH Modern, in and of itself, take $4 billion to $5 billion up? Yes, it could." Friedman assured investors that the RH Modern inventory would be in-stock stating, "[i]nventory at the end of the first quarter was up 24%, and we expect to end the year with inventory growth that is higher than our sales growth given the inventory investments in RH Modern." Further, Boone stated, "[w]e are adding 1.5 million square foot DC [in] northern California in the coming months, actually it's opening this summer. That was planned partially for Modern, both to keep up with the growth we have in the core business but also knowing that Modern was coming. So, we should be very good on supply chain capacity for a while." The Company also emphasized that not only would its delivery window be comparable with what the Company has done in the past, but would also be an advantage for the Company. Friedman stated "[o]n the Modern side, and the lead times, the wait times are a real disadvantage for the people in the marketplace today. We are going to compete on speed just like we would our current business." He continued, "it's going to be a huge competitive advantage versus how the marketplace exists and operates today."

28.     On September 10, 2015, approximately a month before RH Modern's official release, Friedman continued to tout RH Modern, stating that the new product line "can be as big as RH is today or bigger than we are today. There is no reason to believe that RH Modern can't be a multi-billion dollar business in the US." He further stated that RH Modern "is the most important and significant new home furnishings business to be launched in the last 15 or 20 years." The Company again raised

revenue guidance to $2.158 billion to $2.178 billion, representing growth in the range of 16% to 17% from fiscal 2014. The Company also increased its EPS guidance to a range of $3.06 to $3.16, representing growth in the range of 30% to 34%, based on the RH Modern launch. Friedman also reassured investors that bringing the critical new product line to market would not be a problem for the Company stating, "[s]o the great thing about this and why we can go so fast is we know this business. This is a parallel business with a different aesthetic that can be presented in a compelling way that I think is going to completely open up the aperture and the acceptance of the RH brand." Further, Boone reported that inventory was up 29%, stating that inventory growth "is higher than our sales growth given the inventory investments necessary for the launches of RH Modern and RH Teen."

29.    The statements referenced in ¶¶ 26-28 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) contrary to Defendants' representations that the Company was prepared for the launch of RH Modern, that inventory was adequate, and that customers would not face shipping delays, in reality, the Company had severely inadequate inventory and was woefully unprepared to launch RH Modern; and (ii) as a result, RH's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

30.    On December 10, 2015, just two months after the official launch of RH Modern, the Company disclosed that it had missed its earnings projection due to "deceleration from the second quarter based on a shift in the timing of our new product introductions." Specifically, the Company announced that the RH Modern source book magazine had been issued a month later than expected and thus sales for RH Modern were also delayed. The Company further disclosed that while its inventory

9

was up 25% year-over-year, RH Modern furniture was not fully in-stock stating, "[w]e expect RH Modern volumes to build as in-stocks improve." These disclosures caused RH stock to decline by $3.78 per share, wiping out over $153 million in market value on December 11, 2015. The market continued to react to the news on December 14, 2015, causing RH stock to decline $5.16 per share, wiping out an additional $210 million in market value.

31.     To stem this decline, Defendants made false statements to reassure investors about the RH Modern launch, stating "[t]he early data would tell us that [RH Modern is] opening up an entirely new market, it's bringing in new customers, and it's accretive to our current core customers . . . . we're seeing hits on multiple levels, and that's why we're seeing the early response that we're seeing today." Further, while the Company disclosed that RH Modern was not fully instock, it continued to assure investors the Company's industry position was strong, stating that inventory was up 25% year-over-year and that the Company expected "to end the year with inventory growth higher than our sales growth given the inventory investments in RH Modern and RH Teen . . . . The investments we have made in our supply chain and systems infrastructure will enable us to continue to improve our customer experience and support our long term growth." Boone continued that, despite her previous assurances that the Company would be prepared for the release of RH Modern, the reason the Company was low on RH Modern inventory was because it wanted to be conservative initially in purchasing inventory, stating, "[l]et me just clarify, it's not that we were in and then we were out, it's really just a build of getting some of those most initial products. Its every week we get more of the initial runs of things, and a certain -- we certainly want to be conservative with how we buy the inventory." Friedman further reassured investors that the RH Modern launch had been successful and that the lack of inventory was because demand for the product was so high stating, "the best sellers in a new business are always going to sell out, and you're going to always have to respond and catch up with those." Based on these statements, the Company further raised its revenue guidance to a range of $2.17 to $2.18 billion,

representing growth in the range of 16% to 17% and also raised its EPS guidance to a range of $3.11 to $3.16 or 32% to 34% increase from fiscal 2014.

32.    On February 9, 2016, the Company announced that its COO, Dunaj, would be resigning from the Company just one year after he was put in charge of inventory management. Analysts noted that the reasons behind Dunaj's resignation seemed strange. For example, analysts from Buckingham Research stated "[w]hile we were not given any indication as to the nature of Ken Dunaj's resignation other than for personal reasons, we note that the company did not have a good explanation as to the timing of Mr. Dunaj's resignation."

33.    On February 24, 2016, the Company released its 2015 fourth quarter earnings results one month early and announced disappointing earnings. The Company further disclosed that it would be investing $8-$10 million in customer accommodations during the first quarter due to "higher cancellation rates, shipping delays, and our overall initiative to elevate the customer experience . . . . We anticipate that these investments will moderate by the end of the second quarter as we reach optimal in-stock levels for RH Modern and improve our execution." These disclosures caused RH stock to decline by $13.43 per share, wiping out over $546 million in market value.

34.    However, in an effort to stop this decline, the Company downplayed its poor quarterly performance, and falsely reassured investors that the problems related to RH Modern were over. Specifically, in the Company's earnings call for the fiscal fourth quarter ended December 31, 2015, Friedman stated, "we're on the backside of the mountain, if you will. So I think we are on the backside of this now. I think we're past the peak. The in stocks in Modern are going up." Friedman assured investors that 70% of RH Modern products were in-stock stating, "[w]e're currently in the 70% range as far as our in stocks today, and we expect that to build to the mid-80%s by the end of the quarter which is more at a normalized level." Defendants also offered two reasons for its poor performance that shifted blame away from the Company itself. First, Friedman stated, "we are experiencing shipping

11

delays as certain vendors are struggling to ramp up production of this new product line." Second, the Company blamed the underperformance on "markets affected by energy, oil, or currency fluctuations."

35.     While these statements mollified the market, analysts continued to raise questions about the Company's inventory levels related to RH Modern. For example, on May 9, 2016, analysts from BB&T Capital Markets surveyed 50 RH Modern products in order to determine how many were currently in-stock. The analysts found that only 40% of RH Modern products were instock and that the survey results "run counter to management's late March commentary [that] 70% of RH Modern inventory was currently in stock." The analysts noted that the "survey results indicate RH has made scant progress in 'catching up' with RH Modern backorders."

36.     Then on June 8, 2016, RH announced the Company's financial and operating results for the first quarter of 2016 and significantly reduced its earnings guidance for fiscal year 2016, citing "accommodations largely due to . . . production delays" in RH's new product line, RH Modern, which the Company had previously touted as "the most important and significant new home furnishings business to be launched in the last 15 or 20 years."  On the same day, the Company held a conference call with analysts and investors to discuss the Company's earnings and operations for the first quarter of 2016. During that call, Boone disclosed the Company had "invested approximately $18 million during the first quarter in customer accommodations and related expenses, largely as a result of RH Modern production delays," nearly twice as much as the Company stated it would spend to accommodate customers just months earlier.

37.     Analysts noted their shock and disappointment in the true state of RH's operations. For example, analysts from BB&T Capital Markets stated they were "flabbergasted by how quickly the wheels appear to be falling off of RH, and think the last two quarters' debacles cast significant doubt on management's credibility and ability to achieve its long-term financial targets."

38.     On this news, RH's share price fell $7.66, or 21.24%, to close at $28.41 on June 9, 2016, wiping out over $311 million in market value on that day alone.

39.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired RH common shares traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RH common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by RH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

13

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of RH;

- whether Defendants caused RH to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of RH securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

46.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- RH common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold RH common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     This Count is asserted against RH and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.     During the Class Period, RH and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     RH and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of RH common shares during the Class Period.

53.     RH and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of RH were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of RH, their control over, and/or receipt and/or modification of RH allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning RH, participated in the fraudulent scheme alleged herein.

54.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with

reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other RH personnel to members of the investing public, including Plaintiff and the Class.

55. As a result of the foregoing, the market price of RH common shares was artificially inflated during the Class Period. In ignorance of the falsity of RH's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of RH common shares during the Class Period in purchasing RH common shares at prices that were artificially inflated as a result of RH's and the Individual Defendants' false and misleading statements.

56. Had Plaintiff and the other members of the Class been aware that the market price of RH common shares had been artificially and falsely inflated by RH's and the Individual Defendants' misleading statements and by the material adverse information which RH's and the Individual Defendants did not disclose, they would not have purchased RH's common shares at the artificially inflated prices that they did, or at all.

57. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

58. By reason of the foregoing, RH and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of RH common shares during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

59.　Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.　During the Class Period, the Individual Defendants participated in the operation and management of RH, and conducted and participated, directly and indirectly, in the conduct of RH's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

61.　As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to RH's financial condition and results of operations, and to correct promptly any public statements issued by RH which had become materially false or misleading.

62.　Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which RH disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause RH to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of RH within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of RH common shares.

63.　By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by RH.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: March 16, 2017

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:   (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _Peter J Errichiello Jr_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against RH ("RH" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire RH securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired RH securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in RH securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed _____2-9-17_____
                    **(Date)**

_____
                    **(Signature)**

Peter J. Errichiello Jr
                    **(Type or Print Name)**

**RH (F/K/A RESTORATION HARDWARE HOLDINGS, INC) (2017) (RH)**          **Errichiello, Peter. J, Jr.**

**LIST OF PURCHASES AND SALES**

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 3/2/2016 | Purchase | 100 | $37.7700 |